## PACIFIC FIRST FEDERAL SAVINGS BANK, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT *

Docket No. 27606–87.                    Filed July 28, 1993.

*Alan S. Kaden* and *John F. Coverdale,* for petitioner.
*Fera Wagner* and *Richard Osborne,* for respondent.

### SUPPLEMENTAL OPINION

WELLS, *Judge:* The instant case is before us on remand from the Court of Appeals for the Ninth Circuit. In *Pacific First Fed. Sav. Bank v. Commissioner,* 961 F.2d 800 (9th Cir. 1992), revg. and remanding 94 T.C. 101 (1990), the Court of Appeals reversed our decision that section 1.593-6A(b)(5)(vi) and (vii), Income Tax Regs., adopted in 1978 (the 1978 regulations), T.D. 7549, 1978-1 C.B. 185, 187, was invalid. In our prior opinion, we held that the 1978 regulations were an impermissible interpretation of the statutes they purported to interpret. The 1978 regulations govern the calculation of the allowable deduction for addition to bad debt reserve

---

*This opinion supplements our opinion in *Pacific First Fed. Sav. Bank v. Commissioner,* 94 T.C. 101 (1990), revd. and remanded 961 F.2d 800 (9th Cir. 1992).

under the percentage of taxable income method.[1] In *Georgia Fed. Bank v. Commissioner,* 98 T.C. 105, 106-107 (1992), on appeal (11th Cir., Nov. 3, 1992), we explained the operation and effect of the challenged provision of the 1978 regulations as follows:

subdivisions (vi) and (vii) of section 1.593-6A(b)(5), Income Tax Regs., * * * generally provide that taxable income is to be reduced by any NOL carrybacks before the deduction for addition to bad debt reserve is calculated. Sec. 1.593-6A(b)(5)(vii), Income Tax Regs. * * * Taking NOL carrybacks into account in such manner reduces the base of taxable income on which the bad debt reserve addition is calculated, and so reduces the deduction below the amount originally calculated in the taxable year to which the NOL carryback is applied.

The 1978 regulations reversed the approach used in prior regulations adopted in 1964 (the 1964 regulations), which had provided that carrying back an NOL to a prior year did not affect the amount of the allowable bad debt deduction originally calculated for such year. Sec. 1.593-6(b)(2)(iv), Income Tax Regs., T.D. 6728, 1964-1 C.B. (Part 1) 195, 202, superseded by T.D. 7549, 1978-1 C.B. 185; T.D. 7626, 1979-2 C.B. 239. The 1964 regulations incorporated the holding of a 1958 revenue ruling in which such position originally had been stated. Rev. Rul. 58-10, 1958-1 C.B. 246. Thus, the 1978 regulations reversed an ordering rule that had been in effect for approximately 20 years.

The Court of Appeals for the Ninth Circuit held that the 1978 regulations represented a permissible interpretation of the statute and remanded the case to us for consideration of petitioner's alternative argument that the 1978 regulations should not have been applied retroactively to force recalculation of its deduction for addition to bad debt reserve in the pre-1978 years to which it carried back its NOL's, an issue we did not reach in our prior opinion because of our holding on the invalidity of the 1978 regulations. *Pacific First Fed. Sav. Bank v. Commissioner, supra* at 808. We will accordingly consider petitioner's alternative argument on the basis that the 1978 regulations are a permissible interpretation of the governing statute.

---

[1] Under such method, the allowable deduction for addition to bad debt reserve may not exceed a specified percentage of taxable income, calculated in the manner provided in the Code and regulations. See generally *Pacific First Fed. Sav. Bank v. Commissioner,* 94 T.C. 101 (1990), revd. and remanded 961 F.2d 800 (9th Cir. 1992).

The facts relevant to the issue before us may be extracted from our prior opinion and briefly summarized for the purpose of this opinion. Petitioner used the "percentage of taxable income method" set forth in section 593(b)(2)(A)[2] to calculate its deduction for addition to bad debt reserve. *Pacific First Fed. Sav. Bank v. Commissioner,* 94 T.C. at 102. Under such method, petitioner was allowed to claim a deduction for addition to bad debt reserve equal to a specified percentage of taxable income in each such year.[3] During 1981 and 1982, petitioner had NOL's of $43,459,246 and $27,748,382, respectively. *Id.* at 103. Under section 172(b)(1)(F), such NOL's may be carried back to each of the 10 taxable years preceding the loss. The carryback is accomplished by filing an amended return for such year.

Petitioner seeks to apply the NOL's to reduce its taxable income in years 1971 through 1980 without recalculating the deductions for addition to bad debt reserve originally claimed for such years.[4] Respondent, on the authority of the 1978 regulations, determined that the taxable income for such years should have been first reduced by the NOL carrybacks before the deduction for addition to bad debt reserves allowable for such years was calculated.

The revised regulations provide as follows:

(5) *Computation of Taxable Income.* For purposes of * * * [calculating the deduction for addition to bad debt reserve under the percentage of taxable income method], taxable income is computed—

\* \* \* \* \* \* \*

(vi) For taxable years beginning before January 1, 1978, without regard to any deduction the amount of which is computed upon, or may be subject to a limitation computed upon, the amount of taxable income, and without regard to any net operating loss carryback to such year from a taxable year beginning before January 1, 1979. (For purposes of this subparagraph, a net operating loss deduction under section 172 is not a deduction the amount of which may be subject to a limitation computed upon the amount of taxable income.)

[Sec. 1.593-6A(b)(5)(vi), Income Tax Regs.]

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3] For the years in issue, such percentage was between 40 and 54 percent of taxable income. *Pacific First Fed. Sav. Bank v. Commissioner,* 94 T.C. at 102-103 n.2.

[4] Because the retroactivity issue only affects pre-1978 years, petitioner is required to recalculate its allowable deduction for addition to bad debt reserve for 1978, 1979, and 1980 even if we decide such issue in petitioner's favor due to the Court of Appeals for the Ninth Circuit's decision that the 1978 regulations are valid.

In our prior opinion, we explained the operation of the 1978 regulations with respect to the treatment of NOL's in calculating the deduction for addition to bad debt reserve as follows:

For taxable years beginning after December 31, 1977, * * * [sec. 1.593-6A(b)(5)(vii), Income Tax Regs.] expressly requires that taxable income reflect the section 172(a) deduction prior to calculating the deduction for addition to bad debt reserve. For taxable years beginning before January 1, 1978, subdivision (vi) requires, by negative implication, that taxable income reflect NOL carrybacks from years beginning after December 31, 1978, prior to calculating the deduction. As originally promulgated on May 17, 1978, the ordering rule was to affect only taxable years beginning after December 31, 1977. T.D. 7549, 1978-1 C.B. 185, 186. Proposed amendments to the regulation would have required retroactive use of the ordering rule for NOL's occurring after 1977 (43 Fed. Reg. 60964 (Dec. 29, 1978)), but the regulation was amended on May 31, 1979, to have retroactive effect only for NOL's occurring after 1978. T.D. 7626, 1979-2 C.B. 239, 240. [*Pacific First Fed. Sav. Bank v. Commissioner*, 94 T.C. at 104.]

Accordingly, while the 1978 regulations operate prospectively in that they apply only to NOL's arising after 1978, they have retroactive effect when such losses are carried back to pre-1979 years because the deduction for addition to bad debt reserve must be refigured according to the ordering rule provided in the 1978 regulations, and not under the rule provided in the 1964 regulations, which was in effect at the time the deduction was originally calculated. T.D. 7626, 1979-2 C.B. 239, 240. Petitioner argues that the effective date for the change in the ordering rule provided in the initial version of the 1978 regulations promulgated on May 17, 1978 (the initial effective date), should be adhered to and that the revised effective date (the revised effective date), contained in the 1979 amendment referred to in the above quotation from our prior opinion, was improper. Respondent argues that the revision in the effective date, which made the ordering rule retroactive, was a proper exercise of discretion. Respondent concedes that, under the initial effective date, petitioner is not required to recalculate its deduction for addition to bad debt reserves in the pre-1978 years to which it seeks to carry back the 1981 and 1982 NOL's. Accordingly, we will consider the parties' arguments.

The new ordering rule contained in the 1978 regulations was made retroactive pursuant to the authority granted by

section 7805(b), which permits the Secretary to prescribe the extent to which a regulation will have retroactive effect. See generally *Helvering v. Griffiths,* 318 U.S. 371, 397-399 n.49 (1943). Treasury regulations are ordinarily retroactive to the effective date of the statute to which they relate, unless such retroactive application is limited. *Redhouse v. Commissioner,* 728 F.2d 1249, 1251 (9th Cir. 1984), affg. *Wendland v. Commissioner,* 79 T.C. 355 (1982). A failure to limit the retroactive application of a regulation will not be disturbed unless it amounts to an abuse of discretion. *Automobile Club v. Commissioner,* 353 U.S. 180, 184 (1957); *Redhouse v. Commissioner, supra* at 1251; *Madorin v. Commissioner,* 84 T.C. 667, 681 (1985); *Elkins v. Commissioner,* 81 T.C. 669, 680 (1983).

Whether an abuse of discretion has occurred is a question of fact.[5] *Rodebaugh v. Commissioner,* 518 F.2d 73, 75 (6th Cir. 1975), affg. T.C. Memo. 1974-36; *Ballentine Motor Co. v. Commissioner,* 321 F.2d 796, 800 (4th Cir. 1963), affg. 39 T.C. 348 (1962); *Capitol Fed. Sav. & Loan v. Commissioner,* 96 T.C. 204, 213 (1991); *Foster v. Commissioner,* 80 T.C. 34, 160 (1983), affd. in part and vacated in part on another issue 756 F.2d 1430 (9th Cir. 1985). A taxpayer attempting to demonstrate an abuse of discretion carries a heavy burden of proof. *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 533-534 (1979). We have previously stated our approach to questions involving abuse of discretion as follows:

In reviewing the Commissioner's actions, however, we do not substitute our judgment for the Commissioner's, nor do we permit taxpayers to carry their burden of proof by a mere preponderance of the evidence. Taxpayers are required to clearly show that the Commissioner's action was arbitrary, capricious, or without sound basis in fact. [*Capitol Fed. Sav. & Loan v. Commissioner, supra* at 213; citations omitted.]

Where a taxpayer carries the heavy burden of proving abuse of discretion, a broader scope of inquiry is allowed than in

---

[5] The Court of Appeals for the Ninth Circuit has on occasion stated that the question of whether a new standard is to be applied retroactively is one of law. *Oil, Chemical & Atomic Workers Local 1-547 v. NLRB,* 842 F.2d 1141, 1144 n.2 (9th Cir. 1988). We find such principle not to be applicable in the instant case. We note that, in *Foster v. Commissioner,* 80 T.C. 34 (1983), affd. in part and vacated in part on another issue 756 F.2d 1430 (9th Cir. 1985), the Court of Appeals upheld our review of the Commissioner's exercise of discretion under sec. 482, in which we held that the question of whether such discretion had been abused was a question of fact. Furthermore, the cases in which the de novo standard has been applied involved retroactive application of rules announced by means of adjudication, which is not the type of rulemaking involved here.

the usual case. *Branerton Corp. v. Commissioner,* 64 T.C. 191, 200-201 (1975). Accordingly, we may examine the process by which the decision to change the effective date of the 1978 regulations was made.

Respondent argues that making the change in the ordering rule retroactive for post-1978 losses carried back to pre-1979 years was not an abuse of discretion, citing *Manhattan Gen. Equip. Co. v. Commissioner,* 297 U.S. 129 (1936). In *Manhattan Gen. Equip. Co.,* the Supreme Court held that retroactive application of a changed regulation was permissible where the prior regulation dealing with the same issue was inconsistent with the governing statute and unreasonable. *Id.* at 134-135. By citing such case, we take it that respondent continues the argument that the prior ordering rule was erroneous and the 1964 regulations prescribing such rule were invalid and a nullity. In such a case, under *Manhattan Gen. Equip. Co.,* the 1978 regulations are treated as if they were the first regulation issued, and full retroactive application is proper.[6] *Manhattan Gen. Equip. Co.* thus represents an application of the principle that the Commissioner may retroactively correct a mistaken interpretation of the law, even if taxpayers have relied on such interpretation. *Dixon v. United States,* 381 U.S. 68, 79-80 (1965); *Automobile Club v. Commissioner,* 353 U.S. 180, 183-184 (1957). An exception exists, however, in the rare case where a taxpayer would suffer an unconscionable injury due to reliance on an erroneous interpretation. *Schuster v. Commissioner,* 312 F.2d 311 (9th Cir. 1962), affg. 32 T.C. 998 (1959), and revg. *First Western Bank & Trust Co. v. Commissioner,* 32 T.C. 1017 (1959); *Manocchio v. Commissioner,* 78 T.C. 989, 1001 (1982), affd. 710 F.2d 1400 (9th Cir. 1983).

We are not prepared, however, to accept respondent's contention that the 1964 regulations were erroneous. As noted in the various court opinions dealing with the issue, Congress did not expressly state whether it considered such

---

[6] Generally, there is little difficulty with making the first regulations on a particular subject fully retroactive, even where such regulations alter a prior policy not embodied in a regulation, as a taxpayer does not have a "vested interest in a hypothetical decision in his favor prior to the advent of the regulations". *Helvering v. Reynolds,* 313 U.S. 428, 433 (1941); see also *Eastman Kodak Co. v. United States,* 99 Ct. Cl. 569, 48 F. Supp. 357 (1943). But see *Elkins v. Commissioner,* 81 T.C. 669, 681 (1983) (retroactive application of new regulation limited where Commissioner had announced a different rule would be applied and taxpayers had acted in reliance thereon).

regulation correct or incorrect when it enacted the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, on which the 1978 regulations were based. See *Peoples Fed. Sav. & Loan Association v. Commissioner,* 948 F.2d 289, 299 (6th Cir. 1991), revg. T.C. Memo. 1990-129. Our prior opinion in the instant case found that the 1964 regulations were a permissible interpretation of the statute, and the two Courts of Appeals which have reviewed the issue have not concluded otherwise. *Pacific First Fed. Sav. Bank v. Commissioner,* 961 F.2d 800 (9th Cir. 1992), revg. and remanding 94 T.C. 101 (1990); *Peoples Fed. Sav. & Loan Association v. Commissioner, supra.* Indeed, in adopting the 1964 regulations, the Treasury expressly concluded the ordering rule was correct. The transmittal memorandum to Assistant Secretary Stanley Surrey stated:

Existing section 593, like old section 593, does not provide that taxable income should be computed without regard to the net operating loss deduction attributable to a net operating loss carryback. However, this deduction is not in existence at the time the taxpayer determines the amount of its addition to bad debt reserves. A revenue ruling issued in 1958 held that the taxable income limit of old section 593 would be computed with regard to net operating loss carrybacks. This result seems correct and is explicitly set forth both in the notice of proposed rule making and in the proposed Treasury decision. Since section 593 provides that the amount of the bad debt reserve deduction shall be "the amount determined by the taxpayer to be a reasonable addition to the reserve", but not to exceed 60 percent of taxable income, there would seem to be no sufficient reason to reverse the taxpayer's decision by reason of subsequent losses. [Transmittal Memorandum from Mr. Klayman to Mr. Surrey, Apr. 29, 1964.]

Accordingly, the ordering rule contained in the 1964 regulations is one permissible interpretation of section 593.[7] It appears that, in the 1964 regulations, the Treasury adopted a rule that was designed to be consistent with the rules generally applicable to calculating the deduction for addition to bad debt reserve, which held that a reserve addition reasonable at the time it was calculated was not to be modified on account of subsequent events. *Georgia Fed. Bank v. Commissioner,* 98 T.C. 105, 114 (1992), on appeal (11th Cir., Nov. 3 1992), and cases cited therein. In the 1978 regulations, the

---

[7] We held in our prior opinion that it was the *only* permissible interpretation based upon congressional intent. *Pacific First Fed. Sav. Bank v. Commissioner,* 94 T.C. 101, 107-114 (1990), revd. and remanded 961 F.2d 800 (9th Cir. 1992). The Court of Appeals for the Ninth Circuit, however, disagreed and reversed.

Treasury shifted emphasis, attempting to equalize the tax treatment of taxpayers reporting stable incomes with that of taxpayers whose activities might yield income in one year and produce a loss in the next, which is one of the purposes of the net operating loss provisions of section 172. See *Pacific First Fed. Sav. Bank v. Commissioner,* 961 F.2d at 806. The fact that both ordering rules might be consistent with one principle of the income tax law, but contravene another principle, does not establish that either interpretation is erroneous and inconsistent with section 593. Consequently, unlike the superseded regulation in *Manhattan Gen. Equip. Co. v. Commissioner, supra* at 134, the ordering rule set forth in the 1964 regulations was not "out of harmony with the statute" and "a mere nullity".

In relying on the invalidity of the 1964 regulations' ordering rule, moreover, respondent's position misses the point of petitioner's retroactivity argument. Petitioner does not seek to limit the retroactive effect of the changed ordering rule based on its reliance upon the 1964 regulations. Whatever the merits of the ordering rule change in the 1978 regulations, petitioner contends that the abuse of discretion occurred when the regulations were amended in 1979 to incorporate the revised effective date, making the ordering rule of the 1978 regulations applicable to earlier carryback years. Petitioner points out that the 1978 regulations were initially to operate prospectively only, and contends that the change was ill-considered and arbitrary. Respondent's reply is that petitioner is urging the Court to investigate the Treasury's motive in changing the effective date, and that such circumstance is irrelevant to resolving the issue at hand. We do not agree that petitioner is asking for relief based on the motive for the change. Rather, petitioner is alleging that the process leading to the decision to make the change was flawed.

Petitioner relies upon a body of case law which governs an agency's conduct in changing its position on a matter under its jurisdiction. While such case law was developed in connection with changed interpretations of substantive law, we think it is applicable here because such changes are reviewed under an arbitrariness standard, see generally 5 U.S.C. sec. 706 (1988), which is the applicable standard of review in the instant case. In *Georgia Fed. Bank v. Commissioner,* 98 T.C.

105 (1992), on appeal (11th Cir., Nov. 3, 1992), we set forth the standards generally applied in reviewing an agency's change of position. We recognized that "An agency has the flexibility to modify its regulations in the light of experience and to respond to changed circumstances." *Id.* at 109 (citing *Chevron, U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 863-864 (1984)). We also noted, however, that, when the agency does so, it must acknowledge the change and supply a persuasively reasoned explanation for such change. *Id.* at 110 (citing *Motor Vehicle Manufacturers Association v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 48 (1983)). The Supreme Court has held that an agency's change of position may be invalid where:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. * * * [*Motor Vehicle Manufacturers Association v. State Farm Mut. Ins. Co., supra* at 43.]

Furthermore, the changed interpretation must be upheld on the basis of the rationale offered at the time it is announced, and post hoc rationalizations are not to be considered.[8] *Georgia Fed. Bank v. Commissioner, supra* at 110, and cases cited therein.

Petitioner first argues that, having once exercised its discretion to limit the 1978 regulations to prospective effect only, the Treasury could not thereafter exercise its discretion to give them retroactive effect. Petitioner does not cite, and we are unaware of, any authority for such proposition. While we agree with petitioner that section 7805(b)[9] does not authorize the Treasury to modify the retroactive effect of a regulation at will, we see no reason for the initial exercise of such discretion to forever foreclose subsequent modification

---

[8] On brief, respondent attempts to justify the revision in the effective date by pointing out that otherwise the revised ordering rule would not have become effective with respect to NOL carrybacks for 10 years. Respondent argues that such period was too long to wait for the change to become effective. The administrative record prepared at the time the revision in the effective date occurred, however, makes no mention of such concern, and we will accordingly disregard respondent's argument as a post hoc rationalization.

[9] Sec. 7805(b) provides:

SEC. 7805(b). RETROACTIVITY OF REGULATIONS OR RULINGS.—The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

of such initial decision. Each exercise of discretion, therefore, is reviewable on its merits under the standards customarily applied to such action.

Petitioner also argues that the decision to make the 1978 regulations retroactive was made out of "pique" at an article appearing in the Journal of Taxation[10] which suggested that taxpayers could profit from incurring NOL's which could be carried back to pre-1978 years and thus produce larger tax benefits than if they were used in years to which the new regulations applied. Petitioner argues that the Commissioner was aware that any losses produced by devices designed to take advantage of the original effective date of the 1978 regulations could be disregarded under existing tax law principles, rendering the change in effective date unnecessary to deal with the perceived abuse, but that the regulations were made retroactive anyway. Petitioner also alleges that no consideration was given to the compliance burden which would be placed on taxpayers as a result of the change. Petitioner finally notes that the amendment of the effective date contravened an earlier decision of Deputy Secretary Carswell, the second ranking official in the Treasury, that the new rules should apply prospectively only.

Accepting petitioner's representations as accurate, we are not, however, persuaded that such circumstances show that the change in effective date was arbitrary. We do not doubt that the potential abuse could have been dealt with after the fact on a case-by-case basis, as suggested by petitioner. The potential abuse, however, could also be dealt with before the fact by changing the effective date of the 1978 regulation, which is what the Treasury decided to do. While the former method may have been advantageous to taxpayers who did not "manipulate" the rules, the Treasury settled on the latter option, and we believe that modifying the effective date of the 1978 regulations was within the permissible range of alternatives available to deal with the perceived abuse problem, assuming that the new ordering rule is a permissible interpretation and valid exercise of rule-making authority by the Treasury, as we are bound to do under the remand of the instant case by the Court of Appeals for the Ninth Circuit.

---

[10] Schmidt, et al. "Final Bank, Thrift Institution Bad Debt Regs. Offer Planning Opportunities", 49 J. Taxn. 236 (1978).

The record shows that the Treasury preferred dealing with the problem by amending the regulations because it would "avoid subjective determinations as to whether an NOL was artificially created, which would almost certainly be the subject of litigation." Memorandum from Mr. Axelrod to Deputy Chief Counsel Stein, Nov. 9, 1978. The record also indicates that the Treasury had doubt that existing tax law doctrine would be sufficient to correct all "manipulation" which might occur. *Id.* The Treasury's concern about the potential administrative difficulties involved in retaining the original effective date appears well-founded. As the Journal of Taxation article pointed out, taxpayers could realize $19.20 of permanent income tax savings for every $100 of loss carried back, so a real temptation existed for manipulation. Schmidt, et al. "Final Bank, Thrift Institution Bad Debt Regs. Offer Planning Opportunities", 49 J. Taxn. 236, 239 (1978). Under the original effective date, NOL's incurred as late as 1987 could be used to reduce income in years not affected by the 1978 regulations. The question of abusive tax avoidance motivation thus might arise with respect to every NOL incurred by every institution for a 10-year period. The prospect of litigating questions involving the intent of such a numerous class of taxpayers over such a lengthy period of time sufficiently justifies the action the Treasury took to forestall such eventuality.[11]

The fact that the Treasury did not choose the alternative petitioner would have preferred does not make such choice arbitrary. The record shows the Treasury had sound reasons for modifying the effective date of the 1978 regulations. It is not for the courts to substitute their judgment for the Treasury's in such an instance. *Mailman v. Commissioner,* 91 T.C. 1079, 1084 (1988). As the Supreme Court said in reference to a similar situation:

---

[11] As evidence that the Treasury recognized it could adequately deal with the potential abuse by invoking the business purpose doctrine, petitioner points to a memorandum to Assistant Secretary Lubick from Commissioner Kurtz dated Dec. 21, 1978. Such memorandum concludes that implementation of the revised effective date in 1979, instead of 1978, as originally proposed, would not create an abuse problem because the Commissioner could ignore transactions designed to produce a loss to take advantage of the revised effective date. Such statement, however, only refers to the problem of taxpayers' deferring income and accelerating deductions between 1978 and 1979, which is a significantly different issue from taxpayers' engaging in manipulation over the 10-year period during which NOL's could be carried back to years not covered by the 1978 regulations under the original effective date.

Alternatives to the Commissioner's * * * rule are of course available. Improvements might be imagined. But we do not sit as a committee of revision to perfect the administration of the tax laws. Congress has delegated to the Commissioner, not to the courts, the task of prescribing "all needful rules and regulations for the enforcement" of the Internal Revenue Code. In this area of limitless factual variations "it is the province of Congress and the Commissioner, not the courts, to make the appropriate adjustments." * * * [*United States v. Correll,* 389 U.S. 299, 306-307 (1967); fn. refs. and citations omitted.]

With respect to the compliance burden imposed by the amended rule, the record shows that the Treasury was aware of and took into account the potential hardship on taxpayers that would result if the 1978 regulations were made fully retroactive to the date of passage of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487. Because retroactive application of the 1978 regulations would have required taxpayers to recalculate deductions for additions to bad debt reserve and file amended returns, the Treasury initially considered limiting their retroactive effect to the date the proposed change in the ordering rule was first announced. Transmittal Memorandum from Commissioner Kurtz to Assistant Secretary Lubick, Feb. 22, 1978. Apparently, Deputy Secretary Carswell, the second ranking official in the Treasury, decided that the changed ordering rule in the 1978 regulations should be applied prospectively only when the 1978 regulations were finalized in 1978 in order to further limit the potential hardship. Memorandum from Commissioner Kurtz to Deputy Chief Counsel Stein, May 10, 1978.

Petitioner argues that the 1979 adoption of the revised effective date was made without consideration of the factors which led to the original decision to have the 1978 regulations operate prospectively only. Petitioner argues that such circumstances render the 1979 change adopting the revised effective date arbitrary. We disagree. The administrative record shows that the reason the new ordering rule was made to operate prospectively only was to spare taxpayers the burden of filing amended returns which would not otherwise have been filed. Memorandum to Assistant Secretary Lubick from Commissioner Kurtz, Dec. 21, 1978; Notice of Proposed Rulemaking, 43 Fed. Reg. 60964 (Dec. 29, 1978). The limited retroactive effect given the 1978 regulations was carefully tailored to deal with the potential abuse and to

spare taxpayers hardship. The amendment had no effect on pre-1979 years to which no post-1978 NOL was carried back, and so the changed rule would not require the filing of amended returns where none would otherwise be required.

Only taxpayers incurring loss carrybacks in post-1978 years, who would be filing amended returns in any event, were required to recalculate their deductions for addition to bad debt reserve under the 1978 regulations. Moreover, only losses arising in post-1978 years, where a continuing incentive for manipulation existed, were affected by the new ordering rule of the 1978 regulations. Finally, responding to hardship claims by taxpayers, who represented that they had engaged in transactions in reliance upon the initial effective date, the Treasury provided that the revised effective date would not apply to losses arising in 1978, notwithstanding the potential incentive to create an NOL in 1978 afforded by the initial effective date. T.D. 7626, 1979-2 C.B. 239, 240.

Petitioner suggests that, since the 1979 amendment reversed the Deputy Secretary's earlier decision, the Deputy Secretary should have been consulted about the change. Petitioner notes that the initial decision to make the regulations operate only prospectively was taken over the opposition of other officials in the Treasury. See Memorandum from Acting Assistant Secretary Lubick to Secretary Blumenthal. We do not think, however, that such internal disagreements rendered it necessary, in order for the rule change to be valid, to consult Deputy Secretary Carswell about the proposed change in effective date. The 1979 change in effective date was duly approved by the Acting Assistant Secretary (Tax Policy), to whom the authority to do so was delegated by the Secretary of the Treasury, thus complying with the statutory and administrative requirements for the adoption of regulations. Secs. 7805, 7701(a)(11)(B); T.D.O. 150-41, 1956-1 C.B. 1009, superseded by T.D.O. 111-2, 1981-1 C.B. 698. We decline to add a requirement that every official who has been consulted in the deliberative process leading up to adoption of a rule be subsequently consulted and consent to any change of such rule.

In conclusion, it appears that, in changing the effective date of the new ordering rules, the Treasury was simply exercising its power to modify its rules in the light of experience and to respond to altered circumstances. The adminis-

trative record states that, in adopting the initial effective date, the Treasury had not considered the effect of carrybacks from years covered by the 1978 regulations to prior years governed by the original regulation. Memorandum to Assistant Secretary Lubick from Commissioner Kurtz, Dec. 21, 1978. The record further states that allowing such carrybacks was done inadvertently, opening a "loophole" which could be "manipulated" by taxpayers. Opening Memorandum, Nov. 20, 1978. We find no basis for disbelieving such statements, given that the decision to make the regulations prospective only was made shortly before the final rules were issued, and consideration of all ramifications of such decision may well not have occurred.[12] While petitioner suggests that such admission reflects negatively on the Commissioner's drafting ability, we do not think that the Treasury should be deprived of the opportunity to subsequently correct its oversight, especially where a temptation to manipulate the rules for unintended advantage had been created. We accordingly hold that revision of the effective date of the 1978 regulations, making them retroactive for NOL's occurring after 1978, was a permissible exercise of the discretion conferred on the Secretary by section 7805(b).

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[12] The regulation history record shows that the Deputy Secretary, on May 10, 1978, ordered the change in effective date, and the final regulation was sent to the Federal Register for publication May 12, 1978.